## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHSUETTS

| | |
|---|---|
| BONNIE CURRAN,<br><br>        Plaintiff,<br><br>v.<br><br>JOHN CODDINGTON, in his individual capacity,<br><br>        Defendant. | C.A. No. _____ |

**COMPLAINT JURY DEMAND**

### I. INTRODUCTION

1.      Bonnie Curran was an employee of the Medford Housing Authority from 2003 until her unlawful termination in March 2017. Her termination was a direct result of her refusal to be silenced during the last seven years of her employment in the face of mounting pressure from her superiors not to report violations of law and other matters of public concern to government authorities. In a unanimous vote, the Massachusetts Civil Service Commission overturned her termination in August 2019 and ordered her reinstated. The Commission also found that part of the basis for her termination was past discipline motivated by animosity toward Curran's role as a watchdog at the MHA. Curran's practice of reporting violations of law and other matters of public concern about MHA was clearly protected First Amendment activity, and her termination from employment was in response to such speech. As such, she brings a claim under 42 U.S.C. § 1983 for violation of her right to Freedom of Speech and seeks damages for lost wages, emotional distress, punitive damages, and any other relief allowed by law.

### II. PARTIES

2.      Bonnie Curran is a former employee of the Medford Housing Authority (MHA) and a resident of Revere, Massachusetts.

3.      John Coddington is the former Executive Director of the MHA and, upon information and belief, a resident of Massachusetts.

### III. FACTS

4.      Bonnie Curran began working as a Section 8 leased housing specialist for MHA in 2003.

5.      Curran had an unblemished employment record prior to 2009.

6.      In 2009, the MHA Board of Directors (Board) hired Robert Covelle as its Executive Director.

7.      From the inception of her contacts with Covelle, Curran was concerned about his policies and practices, including, among other things, his requests to favor applicants, his efforts to hire friends and family in violation of MHA rules and regulations, and his practice of disparaging her without her knowledge. She made her concerns known to Covelle and to the MHA Board. Ultimately, she filed confidential complaints[1] with state and federal authorities that led to Covelle's involuntary resignation in 2012.

8.      Curran received multiple disciplinary actions, including suspensions, under Covelle.

9.      Coddington ultimately became Executive Director in 2013 after Covelle resigned.

10.     A year into Coddington's tenure as Executive Director, Coddington issued Curran a five-day suspension and a final warning after she got into a dispute with the Leased Housing Director Sam Piri. Codding cited the previous discipling issued by Covelle as a basis for the level of discipline.

---

[1] As noted by the Civil Service Commission, Curran raised numerous concerns about Covelle to government authorities, including financial improprieties such as underreporting and not reporting tenant incomes, and giving friends priority for public housing vouchers over prospective tenants on the waiting list.

11.     In 2015, Curran reported that she had been working unpaid hours to her new supervisor Kathy Fortier. She followed this report with an inquiry about unpaid hours to the United States Department of Labor and provided the reports from the Department of Labor to Fortier.

12.     On February 10, 2016, Coddington issued a third "final warning" to Curran, citing two unrelated incidents, and noting her prior discipline again as a basis for the level of discipline.

13.     In the summer of 2016, MHA hired Anne Marie Moglia as the new Leased Housing Director. Moglia promised to eliminate the practice of allowing overtime, which was routinely permitted, unless it was pre-approved.

14.     Curran objected to the change in overtime rules because she could not complete her work in the allotted time. She worked thirty minutes past her regular end-time on two occasions in November 2016, without expecting or asking to be paid for the extra time, and received a written warning a few days later.

15.     On December 9, 2016, Curran was issued a Last Chance warning as discipline after a co-worker claimed that she resigned from the MHA due to Curran's conduct, including a veiled threat.

16.     On January 5, 2017, Coddington notified Curran in writing that she was being placed on paid administrative leave effective immediately after a second co-worker claimed to have resigned because of Curran, and that the Board would hold a hearing to consider her possible termination.

17.     The Board designated Coddington as its hearing officer and held a hearing regarding Curran's proposed termination on January 18, 2017.

18.    On March 3, 2017, Coddington submitted Findings and Recommendations to the Board that included a section on Curran's past discipline. This section focused on what Coddington described as a "long and highly unsatisfactory disciplinary record," citing the discipline Curran had received from 2011 through December 8, 2016.

19.    At a special executive session on March 8, 2017, the Board voted to accept Coddington's recommendation to discharge Ms. Curran.

20.    Curran filed a timely appeal of her discharge to the Civil Service Commission.

21.    On August 15, 2019, the Civil Service Commission ruled that the MHA did not have just cause to discharge Curran, and ordered MHA to reinstate her and restore her full benefits and compensation. A copy of the decision is attached to this complaint as Exhibit A.

22.    The Commission found that MHA did not show that Curran caused the two co-workers to leave their positions because of her behavior.

23.    The Commission found that the "discipline Curran received from 2011 to 2014 that had some nexus to Mr. Covelle's tenure, was more likely than not tainted by animosity against her stemming from her reputation as a 'watchdog', and deserve[d] little, if any, weight."

24.    The Commission also found that Curran's "proclivity to call out unlawful behavior of her peers and superiors did not stop after the departure of Mr. Covelle but, in fact, she continued bringing complaints to management, which were regularly ignored, all the way through 2015 and 2016 until her termination." The Commission was "not certain whether management's animus stemmed from Ms. Curran's refusal to 'play along' or from her persistent critiques, or both, but the animus was definitely present."

25.     Coddington was motivated to recommend the termination of Curran because of the past discipline of Curran, and such past discipline was based on the impermissible factors of her protected speech.

26.     Coddington was also independently motivated to recommend the termination of Curran based on her record of First Amendment activity where she had a reputation as an employee who refused to be silent on matters of public concern.

27.     By his unlawful actions, Coddington caused the termination of Curran.

28.     Curran suffered damages from Coddington's unlawful actions, including lost wages and significant emotional distress.

## <u>COUNT I</u>

### 42 U.S.C. § 1983 -- FIRST AMENDMENT

The actions of Defendant as set forth above, including, *inter alia*, recommending and then causing the discharge of Plaintiff because of her exercise of freedom of speech, is a violation of the First Amendment, causing damages.

WHEREFORE, Plaintiff prays this Court:

1. ORDER the Defendant to pay compensatory damages to Plaintiff for lost wages, emotional distress and pain and suffering and any other damages as allowed by law;

2. ORDER the Defendant to pay punitive damages and reasonable attorneys' fees;

3. ORDER any further relief as is just and necessary.

Respectfully submitted,
PLAINTIFF BONNIE CURRAN,
By her attorneys,

_____/s/ Joseph Sulman_____
Joseph L. Sulman, BBO #663635
Andrea L. Haas, BBO # 671844
Law Office of Joseph L. Sulman, Esq.
391 Totten Pond Road, Suite 402
Waltham, MA 02451
(617) 521-8600
jsulman@sulmanlaw.com
ahaas@sulmanlaw.com

December 19, 2019

# EXHIBIT A

**COMMONWEALTH OF MASSACHUSETTS**
**CIVIL SERVICE COMMISSION**

**SUFFOLK, ss**.

One Ashburton Place: Room 503
Boston, MA 02108
(617) 727-2293

**BONNIE CURRAN,**
  *Appellant*
  *v*.                                    **D1-17-056**
**MEDFORD HOUSING AUTHORITY,**
  *Respondent*

Appearance for Appellant:

Joseph Sulman, Esq.
391 Totten Pond Road, Suite 302
Waltham, MA02451

Appearance for Respondent:

John Egan, Esq.
Rubin & Rudman LLP
53 State Street
Boston, MA 02109

Commissioner:

Paul M. Stein

## <u>DECISION</u>

The Appellant, Bonnie Curran, appealed to the Civil Service Commission (Commission), pursuant to G.L.c.121B,§29 & G.Lc.31,§43, from a decision of the Medford Housing Authority (MHA) discharging her from her position as Leased Housing Specialist.[1] The Commission held a pre-hearing conference in Boston on March 20, 2017 and held a full hearing at that location, which was digitally recorded,[2] on September 19 & 26, 2017 and October 19, 2017. The full hearing was declared private, with witnesses sequestered. Thirty-nine (39) exhibits were received in evidence at the hearing (JExhs.1-22; AppExhs.14-19, 21-24, 26, 28 & 32-35).[3] Three post-hearing exhibits were received and marked AppPHExh.37, JPHExh.23 & JPHExh.24. The Commission received Proposed Decisions on December 18, 2017.

---

[1] The Standard Adjudicatory Rules of Practice and Procedure, 801 CMR §§ 1.00, *et seq*., apply to adjudications before the Commission with G.L. c. 31, or any Commission rules, taking precedence.

[2] CDs of the full hearing were provided to the parties. If there is a judicial appeal of this decision, the plaintiff in the judicial appeal becomes obligated to use the CD to supply the court with the stenographic or other written transcript of the hearing to the extent that he/she wishes to challenge the decision as unsupported by the substantial evidence, arbitrary and capricious, or an abuse of discretion.

[3] App.Exhs.1-11, 13, 15, 21, 27, 29-31 & 36 were marked for Identification. AppExs.12, 20, 25 & 26 are duplicates of J.Exhs.17, 15, 16 & 14, respectively.

1

**FINDINGS OF FACT**

Based on the Exhibits entered into evidence and the testimony of the following witnesses:

*Called by the MFA*

- Kathy Fortier, MHA Assistant Director
- Ann Marie Moglia, MHA Leased Housing Director
- Delores Ross, now Delores Brogan, former MHA Leased Housing Specialist
- Kathy Rolli, former MHA Leased Housing Specialist
- John Coddington, former MHA Executive Director
- Kathy Mpelkas, MHA Leased Housing Specialist
- Sam Piri, MHA Leased Housing Specialist

*Called by the Appellant:*

- Bonnie Curran, Appellant
- Lorraine McGrath, former MHA employee

and taking administrative notice of all matters filed in the case, pertinent law and reasonable inferences from the credible evidence, a preponderance of evidence establishes these facts:

1. MHA is a municipal corporation established under Mass. G.L.c.121B to serve low- and moderate-income, disabled and elderly individuals and families residing in the City of Medford, MA (Medford) by providing them with safe and affordable rental housing. MHA is governed by a five-member board of commissioners (Board), which appoints an Executive Director to oversee approximately 40 employees who perform the day-to-day management, administrative and maintenance services necessary to operate eight (8) MHA properties containing approximately 800 federally-subsidized and state-subsidized elderly, disabled and family housing, as well as supporting tenants placed in private rental units under the federal "Section 8" voucher program and in private rental units receiving state-subsidized vouchers. (*Administrative Notice [http://www.medfordhousing.org]*)

2. The Appellant, Bonnie Curran, was employed in the MHA's Leased Housing Department as a Leased Housing Specialist a/k/a Section 8 Coordinator (LHS) from May 14, 2003 until her termination on March 8, 2017. She was a former public housing resident. (*Stipulated Facts; Testimony of Appellant*)

3. The job of an LHS involved qualifying applicants for Section 8 vouchers that entitle them to receive a subsidy for renting from qualified landlords, calculating the rent that landlords could charge and establishing the subsidies that they would receive, according to the applicable laws and regulations promulgated by the federal Department of Housing and Urban Development (HUD) and the Massachusetts Department of Housing and Community Development (DHCD), which fund the subsidies. This work required frequent interaction with applicants, tenants, landlords and vendors and included interviewing applicants, computing the allowable rents and subsidies, and performing other related tasks. (*Testimony of Appellant, Coddington, Mpelkas, Piri, Fortier & Moglia)*

4. During most of Ms. Curran's tenure with the MHA, the Leased Housing Department was staffed by approximately three to five LHSs who reported to the Director of Leased Housing. At the time of her termination, Ms. Curran was the most senior member of the department (in terms of years of service). (*Testimony of Appellant, Coddington, Mpelkas, Piri, Fortier & Moglia)*

Prior Disciplinary History

5. Prior to June 2009, Ms. Curran had an unblemished employment record reporting to Anne Petras, then the Director of Leased Housing. (*Stipulated Facts; Testimony of Appellant*)

6. In June 2009, the MHA Board hired Robert Covelle to replace John Greene as the MHA's Executive Director. Mr. Covelle had previously worked at the Somerville Housing Authority. (*Stipulated Facts; Testimony of Appellant & Coddington*).

7. From the inception of her contacts with Mr. Covelle, Ms. Curran become wary of Mr. Covelle, including, among other things, his requests to favor applicants, his efforts to hire friends and family, and disparaging her without her knowledge. She made her concerns known to Mr. Covelle and to the MHA Board and, ultimately, filed confidential complaints with state and

3

federal authorities that led to Mr. Covelle's involuntary resignation in 2012. (*Stipulated Facts;*

*AppExhs.1ID through 8ID, J.Exhs.9 & 32; Testimony of Appellant & McGrath*)[4]

8. In particular, in 2010, when Anne Petras retired as Leased Housing Director,, Mr. Covelle, with Ms. Petras's support, offered to appoint Ms. Curran as her replacement but she declined the offer because of conditions that she found unreasonable. (*AppExhs.1ID,2ID,8ID & 32; Testimony of Appellant*)

9. Thereafter, Kathy Mpelkas was appointed to the position of Leased Housing Director and Mr. Piri, a close friend of Mr. Covelle, was hired as an LHS. About a year later, Ms. Mpelkas stepped down and Mr. Piri became the Leased Housing Director, a position he held until 2014. (*Stipulated Facts; Testimony of Appellant; Mpelkas, Fortier & Piri*)

10. The first disciplinary action taken against Ms. Curran was a written warning issued by Ms. Mpelkas, following an argument between Ms. Mpelkas and Ms. Curran in February 2011, which Mr. Covelle ordered her to issue on pain of him disciplining Ms. Mpelkas instead. Ms. Curran wrote a response to this warning that was placed in her personnel file but it was never produced at the Commission hearing. (*Stipulated Facts; JExhs.1,2,9 & 14; Testimony of Appellant & Mpelkas*)

11. In or about August 2011, a soundproof wall was erected around Ms. Curran's workspace (where a short partition had existed), isolating her from her peers in the Leased Housing Department. The alleged purpose of the wall was described to Ms. Curran as a means to provide

---

[4] The examples of the problematic behavior by Mr. Covelle and others close to him that Ms. Curran reported to the MHA Board and, later, governmental authorities, include: placing derogatory information in her personnel file without her knowledge and disparaging her to others within the MHA and outside, harassing her for refusing to ignore the waiting list so that certain Somerville employees and other friends and relatives got priority for public housing voucher whether they were qualified or not, widespread favoritism in hiring and contracting (including his Bocci partner – Sam Piri as the Leased Housing Director, and others politically connected individuals), financial improprieties, including fudging of unreporting and underreporting tenant incomes and questionable expenditures that, as reported in the Boston Globe, a federal audit disclosed could involve $1.4 million in unjustified spending on "no-bid" contracts to relatives and uncertified contractors, that the MHA may have to repay to the government.(*AppExh.1ID through 8ID; JExh.9; App.Exh.32*)

4

a private space for her to meet with applicants. Initially, Ms. Curran reluctantly assented to construction of the wall, after being assured it could be removed "in an hour" whenever she wanted. As it turned out, the enclosed space impeded ventilation and was so small as to be unsuitable for applicant meetings. (*JExhs.16,20 & 21; AppExh.28; AppPHExh.37; Testimony of Appellant & McGrath*)

12. In July 2012, shortly after Mr. Covelle's departure, Ms. Curran met with Interim Director Michael Pacios and Mr. Piri and asked to have the wall removed, noting that the enclosure around her desk had not served the intended purpose. Mr. Pacios rejected the request, stating in an e-mail that he did not have any maintenance men available to remove the wall and that "the wall is not a priority and should be dealt with by the next administration." (*JExhs.18, 20 & 21; Testimony of Appellant*)

13. During Mr. Covelle's tenure, Ms. Curran also received two additional one-day suspensions in March 2012, apparently precipitated by a complaint from Sam Piri at the end of Mr. Covelle's tenure, and one five-day suspension and "final warning" in March 2013, issued by MHA's Director of Finance (who served as interim Executive Director after Mr. Covelle's departure).  Ms. Curran received no notice of any right of appeal and took no appeal from these suspensions. (*Stipulated Facts; JExhs.1,9,14 & 34; Testimony of Appellant, Coddington & Piri*).[5]

14. Later that month (March 2013), John Coddington, then Executive Director at Everett Housing Authority became the new MHA Executive Director. (*Testimony of Coddington*)

---

[5] Ms. Curran contended that the 2012 disciplines involved disputes about the propriety of declining to reinstate an applicant whom she believed had been removed properly from the waiting list and a complaint by a public housing tenant whom Ms. Curran had been investigating for unreported income. The 2013 suspension involved a complaint by Mr. Piri and Barbara Vivian (another acquaintance hired by Mr. Covelle) about Ms. Curran's alleged rude treatment of an MHA client whom she found had been acting irrationally. (*JExh..9 & AppExh..34; Testimony of Appellant*)

15. In March 2014, Mr. Piri complained that Ms. Curran had failed to comply with his request that she run a so-called "HAPPY" (a program that computes income and rental subsidy figures) on a prospective tenant. Ms. Curran said the applicant's voucher had expired and she was not comfortable running the report because she did not have the information needed to generate the report, without which inputs the report would not be accurate. She also noted that she was assigned additional duties with some priority, including interviewing several fire victims. Mr. Coddington sided with Mr. Piri, contending that Ms. Curran could have plugged in estimated numbers and given him her "best guess". He imposed a five day suspension and, noting her prior discipline, stated it was another "final warning". Ms. Curran received no notice of her right to appeal the discipline and took no appeal. (*Stipulated Facts*; *JExhs. 3, 9, 14, 19 & 35; Testimony of Appellant, Coddington & Piri*)

16. In January 2015, Ms. Curran complained to Kathy Fortier[6] that she had been working extra hours "for free" to get critical work done, but "will not continue to stay uncompensated going forward, I am sorry." She followed up this complaint with an inquiry to the U.S. Department of Labor and provided Ms. Fortier with the response she received. She was informed that she should be able to complete her work within the regular work week, but MHA did subsequently authorize up to 5 hours overtime per week over the standard 35 hour work week. (*AppExhs.11ID & 13ID; Testimony of Appellant & Moglia*)

17. In July 2015, Ms. Curran gave public testimony to the Massachusetts General Court (which she repeated in April 2017) concerning proposed legislation addressing "constructive discharge" in the form of workplace bullying, mobbing and harassment. (*AppPHExh.37; Testimony of Appellant*)

---

[6] Sam Piri resigned as Leased Housing Director in October 2014 and resumed his position as an LHS. He was replaced by Ms. Fortier who served as Director until September 2016. (*Testimony of Fortier & Piri*)

18. On February 10, 2016, Mr. Coddington issued a third "final warning" to Ms. Curran, citing two incidents: (a) the first incident occurred on or about December 22, 2015 when Ms. Currran walked out of a meeting with Ms. Fortier and went home sick, which Mr. Coddington characterized as "insubordination"[7]; (b) the second incident occurred on or about January 14, 2016, and concerned a tenant who complained about Ms. Curran after she confronted him with evidence that she believed indicated he had unreported/underreported his income).[8]   Mr. Coddington, again, noted her prior disciplinary record, stating that "I have decided to once again forego a harsh disciplinary sanction" and give her "one last chance to contribute to the mission of this Authority." (*Stipulated Facts; JExhs.4 & 9; Testimony of Appellant, Fortier & Coddington*)

19. Ms. Curran did make a written complaint to MHA's "Director of Human Resources (Unknown)" following the February 16, 2016 warning letter, but got no response. No evidence was produced to indicate that anyone at MHA investigated this complaint.. (*JExhs.9 & 12; AppExh.14; Testimony of Appellant*)

20. In August 2016, the MHA conducted an anonymous "Employee Satisfaction Survey", which four members of the Leased Housing Department completed.

- Three of the four responding employees provided very positive opinions about their job, their supervisor and their peers, including, in particular, checking off "Strongly Agree" or "Agree" to statements in the survey such as: "MHA staff has positive professional relationships", "Overall, I am satisfied with my job", "There is good cooperation between

---

[7] Ms. Curran believed that the 2015 dispute with Ms. Fortier followed Ms. Curran's earlier reporting of what she believed was neglect of duty and fraudulent behavior by another (contract) employee. (*AppExh.14; JExh.36ID; Testimony of Appellant*)

[8] According to Ms. Curran, the 2016 incident was the second such confrontation with this tenant. In the prior confrontation, Ms. Curran sought out her supervisor (Ms. Fortier) who intervened, diffused the situation and obtained an apology from the tenant.  Ms. Curran claimed that she similarly sought out Mr. Coddington's assistance in 2016, but he did not respond to her request for help and, in fact, treated her disrespectfully. (*JExh.9;AppExh.14; Testimony of Appellant*)

7

my work group and other work groups", "Overall I think management is doing a good job" and "I will probably be working for MHA three years from now."

- Only one survey response was "Neutral" about overall job satisfaction, professional relations at MHA, and whether the employee thought they would be working at MHA for three more years; and "Disagreed" or "Strongly Disagreed" with more than two dozen of the survey statements, including whether management was doing a good job.

(*AppExh.16; Testimony of Appellant*)

Ann Marie Moglia Is Hired as Leased Housing Director

21. In the summer of 2016, Ms. Fortier was promoted to Assistant Executive Director. In September 2016, Ann Marie Moglia, who had over twenty years' experience with the Methuen Housing Authority, was hired as the MHA Leased Housing Director. (*Testimony of Moglia*)

22. Ms. Moglia came to the MHA with specific ideas about how a Leased Housing Department should be run. In particular, soon after she arrived, she changed the prior practice and directed that overtime, which had been routinely allowed, would be curtailed and would need justification and prior authorization by her, stating that the LHSs at MHA handled a smaller workload compared to what she was familiar with and she saw no reason why the staff could not get their work done during regular working hours. She also implemented changes in forms and procedures. (*See AppExhs.22 through 24; Testimony of Appellant &Moglia*)

23. Ms. Curran was critical of the changes in the procedures Ms. Moglia had introduced and a purported lack of consideration given to her in particular [Curran] about how to implement them properly. Ms. Curran has also made her views known at staff meetings. As a result of these circumstances, Ms. Moglia's initial positive impressions of Ms. Curran soon soured. (*JExh.15; AppExhs.15,18,19 & 24; Testimony of Appellant & Moglia*)

8

24. Ms. Curran also protested that her workload was, in fact, more than she could handle. This issue came to a head after she worked past her regular quitting time of 4:30 on November 22, 2016 (until 5:02) and on November 28 (until 5:01), without obtaining prior authorization. She did not claim or expect to be paid overtime for staying late.  On November 30, 2016, Ms. Moglia issued her a written warning for violating MHA overtime rules. (*Stipulated Facts; JExh. 5 & 15; App.Exhs.18, 20, 23 & 24; Testimony of Appellant & Moglia*)

<u>The Events Leading To The Termination of Ms. Curran's Employment</u>

25. In September 2016, John Coddington announced that he was not seeking to renew his employment contract and would be leaving MHA in March 2017. (*Testimony of Coddington*)

26. In October 2016, Delores Ross -- who had been Mr. Coddington's administrative assistant at the Everett Housing Authority and whom he recruited to the MHA in 2015 to become an LHC with an increase in pay – announced that she would be leaving MHA and returning to the Everett Housing Authority. (*JExh.23; Testimony of Appellant, Coddington & Ross*)

27. At her exit interview on November 16, 2016, Ms. Ross told Ms. Moglia that she was leaving MHA because of Ms. Curran whom she described as mentally ill, "sometimes on meds" and "you never knew what she's going to be like".  She described one incident in September 2016, when Ms. Curran had allegedly told her something to the effect: "You know I wouldn't intentionally hurt you", which she said she considered a threat and became fearful she would be attacked in the parking lot. [9]  She said she heard that seven people (whose names she could not identify) left MHA because of Ms. Curran. (*JExhs.6 &.8; Testimony of Moglia & Ross*)

---

[9] Ms. Ross testified that she got along well with Ms. Curran for the first six months of her employment. The referenced September 2016 remark came after Ms. Curran had mentioned in a meeting with Ms. Fortier and Ms. Ross that Ms. Ross had once confided that she had been "bullied" in her prior job. The statement was made by Ms. Curran as after that meeting in the nature of an apology for breaking Ms. Ross's confidence. Ms. Fortier and Mr. Coddington both knew about the September 2016 remark but it was never known as or considered a threat and no action was taken about it at the time. For these and other reasons, I do not find Ms. Ross's alleged fear of Ms. Curran credible. (*JExh.6; Testimony of Appellant, Ross, Fortier & Coddington*)

28. Ms. Ross also provided other reasons that explained her decision to leave including: (a) disliking MHA because she found the applicants "difficult", the closing process was "complicated", she was unfamiliar with the computer system, and her supervisor was "busy" and "wasn't always available"; and (b) had she known that she would be working in close quarters in a basement and realized how difficult the "tenant selection" process was, she "may not have accepted [the] position." Ms. Ross had also made this discomfort with her job known to others prior to her resignation. (*JExhs.6, 8, 9, 15 &18; AppExh.20: Testimony of Appellant, Ross & Fortier*)

29. On November 28, 2016 (two days before issuing the overtime discipline warning), Ms. Moglia and Ms. Fortier met with Ms. Curran. The meeting covered Ms. Ross's recent exit interview, including the claim that Ms. Ross's fear of Ms. Curran was the principal reason she gave for her decision to resign and, in particular, that Ms. Ross said she felt threatened by being told by Ms. Curran that she would never intentionally hurt Ms. Ross. The meeting also covered an ongoing issue involving Ms. Curran's concerns that she continued to be harassed by other staff ("the Covelle crowd" as Ms. Curran sometimes called them, among whom she counted current MHA employees Sam Piri and Barbara Vivian) with particular focus on a then pending tenant hearing decision in Ms. Curran's "work cue [sic]" that she believed was being unduly delayed. Finally, Ms. Curran was asked about whether she was using MHA time and equipment to record her daily exchanges with other employees. (*JExs.6,9,10 & 15; AppExhs.20, 25 & 28; Testimony of Appellant, Fortier & Moglia*)

30. Ms. Curran was given the opportunity to respond to the allegations made by Ms. Ross. She acknowledged the accuracy of the September 2016 remark to Ms. Ross, but explained that the context was in the nature of an apology, not a threat. Ms. Curran explained that she was only

10

making notes in a personal diary, and did not do so on MHA time.  She provided examples of how she believed Ms. Fortier and Ms. Moglia had not been supportive. Ms. Curran also said she felt put on the spot and found it difficult to respond to questions without prior notice. The meeting concluded with Ms. Curran's agreement to follow-up with Ms. Moglia on the tenant hearing issue, which she did by Memo on November 30, 2016.  Ms. Curran was not informed at the November 28, 2016 meeting that MHA was taking or contemplating any specific disciplinary action at that time. (*JExhs.9,15; App.Exhs.15,20; Testimony of Appellant*)

31. On December 9, 2016, Ms. Curran was called into another meeting and provided a copy of a Memorandum dated December 8, 2016 drafted by Ms. Fortier entitled: "Memorialize Meeting and Summary/Results – Meeting Date 11/28/2016". After setting forth Ms. Fortier's version of the substance of the meeting, she concluded:

> In concluding our meeting, I conveyed to you that I expect you to never again engage in any conduct or activity that could be construed as direct threats, or veiled threats. You and all employees are responsible for ensuring a friendly work environment. This includes practicing self-awareness with your tone and the language you choose to address your colleagues, tenants and landlords. There are absolutely no excuses or exceptions to this performance expectation.

> Additionally, I have reviewed your personnel record and the disciplinary history set forth below.[10]

> Based on the current facts and your disciplinary record, your employment with the MHA should be terminated. Nevertheless, I have recommended to the Executive Director that you receive one "LAST CHANCE" to remain employed with the MHA.

(*Stipulated Facts; J.Exh.6; Testimony of Fortier*)

32. Ms. Curran requested an opportunity to review Ms. Fortier's Memorandum and to provide a written response, which she did by Memorandum dated December 12, 2016, to which was attached a six-page single-spaced paragraph-by-paragraph rebuttal. She vigorously disputed

---

[10] The Memorandum cites discipline dated 1/4/2011, 3/3/2012, 2/22/2013, 4/1/2014 and 2/10/2016. It did not mention the 11/30/2016 "final warning" delivered in the interim between the November 28, 2016 and December 9, 2016 meetings. (*JExh.6; Testimony of Appellant & Fortier*)

11

a substantial number of Ms. Fortier's characterizations of what transpired at the November 28, 2016 meeting as inaccurate, incomplete or taken out of context. For example:

- In response to the allegation that Ms. Ross heard Ms. Curran "typing immediately after the close [of a tenant's case], Ms. Curran stated she used <u>pens</u> to write her personal notes and suggested the typing Ms. Ross heard probably was creating an e-mail to her supervisor about the "close".

- Ms. Curran specifically acknowledged that she would heed Ms. Fortier's "advice not to use compensated time or MHA resources for personal use".

- Ms. Curran's rebuttal took specific issue with the contention that Ms. Ross was leaving because Ms. Curran made her "walk on egg shells", except that Ms. Curran identified with that condition as she feels the same way. Ms. Curran defended in specific terms the substance and context of the alleged offending colloquy with Ms. Ross as benign and pointed to occasions when Ms. Ross had lost her temper in Ms. Fortier's presence.

(*JExh.6 & 15; AppExh.20; Testimony of Appellant*)

32. In addition, although no mention of the subject had been made in the November 28, 2016 meeting or the December 8, 2016 Memorandum, Ms. Curran's rebuttal anticipated that, Kathy Rolli, another recently hired LHC, who had also recently announced her resignation, would blame Ms. Curran for her decision to quit as well. (*JExhs.6 & 15; AppExh.20*)

33. Ms. Rolli came to work at MHA as a LHS in August 2015, from the Reading Housing Authority, where she had been the Assistant Director, a position that she left due to budget cuts. She testified that the job of LHS was "not what she was expecting." She interviewed for the job

of Leased Housing Director that opened up in the summer of 2016 for which Ms. Moglia was selected in September 2016. (*Testimony of Rolli & Coddington*)

34.  On January 14, 2016, Ms. Curran wrote to Mr. Coddington to memorialize an incident in which she had asked for his help with an unruly tenant, when others declined to intervene and a meeting the next day with Mr. Coddington during which she said he took away her pen as she was taking notes. (*AppExh.28; Testimony of Appellant, Coddington and Fortier*)

35.  In September 2016, Ms. Rolli and Ms. Curran had a confrontation in which Ms. Curran complained that Ms. Rolli was not treating tenants with proper respect, allegedly harassing some elderly and disabled clients, as well as possibly wrongfully terminating some clients. Ms. Rolli counter-complained that Ms. Curran's complaints were unfounded.  After speaking to both parties, Ms. Fortier found neither party at fault and took no further action. (*JExh.6,9,10,15; AppExh.20 & 28; Testimony of Appellant, Fortier & Rolli*)[11]

36.  On December 12, 2016 (the day Ms. Curran submitted her rebuttal Memorandum to Ms. Fortier), Ms. Moglia conducted an exit interview with Ms. Rolli.  Ms. Rolli stated that she was leaving MHA for a job with better pay and "better benefits (all-inclusive insurance and profit sharing)" with a previous private sector employer for whom she worked previously.  Ms. Rolli stated that there was much she disliked about MHA, including unrecognized need for overtime pay (forced to leave "abruptly" at 4:30 and "feels she's being thrown out"), the "dirty gloomy environment, overcrowded, loud . . . difficult to concentrate. . . . Air quality poor – no windows – temperature is either hot/cold" and lack of "someone to respond to tenant requests". She also stated that she "doesn't ever want to deal with public housing again", citing specifically the "lack

---

[11] Ms. Curran acknowledged that she can be particularly "rough around the edges", but as a former public housing resident, she  always strives to treat tenants with the dignity she believes they deserve and is quick to admonish anyone who she thinks is not doing so. Ms. Moglia testified that she found Ms. Curran "too friendly" with tenants although she never brought that up with Ms. Curran directly. (*AppExh.28; Testimony of Appellant & Moglia*)

of respect" from "demanding participants" and applicants who are "allowed to be disrespectful to MHA staff". (*JEx.7*)

37. The testimony at the Commission hearing from Lorraine McGrath a former MHA employee, corroborated the reasons stated above that Ms. Rolli was dissatisfied with her job. Ms. McGrath asked Ms. Rolli why she was leaving MHA and Ms. Rolli told her that it was because of the "dirty" work environment, she was not used to not having her own office and she didn't want to do public housing work anymore.  She never mentioned Ms. Curran to Ms. McGrath as a reason for resigning. (*Testimony of McGrath*)

38. At her exit interview, however, Ms. Rolli claimed that she had decided to look for another job because Ms. Curran had been giving her a "hard time right at the beginning", calling Ms. Curran a "vicious and vile" person. Ms. Rolli claimed that she decided to leave MHA in September 2016 because of the verbal incident described above with Ms. Curran, which she claimed was the "final straw." (*J.Exh.7*)

39. At the Commission hearing, Ms. Rolli refused to disclose her current employer, asserting that she remained in fear of Ms. Curran and worried that Ms. Curran would show up at her current workplace to intimidate or harass her. (*Testimony of Ms. Rolli*)[12]

40. On January 5, 2017, having no prior communication, verbal or written, in response to her rebuttal Memorandum, Mr. Coddington (with Ms. Fortier and Ms. Moglia present) delivered a letter to Ms. Curran that stated:

> You are hereby placed on administrative leave with pay, effective immediately. The reasons for this action are as follows:
> - Your conduct caused a second employee (KR) to leave MHA employment.
> - As noted in the disciplinary warning of December 8, 2016, you were given a final LAST CHANCE to reform your conduct.

---

[12] Ms. Rolli provided no additional evidence beyond the conclusory statements in her exit interview to show the basis for her continued "fear" of Ms. Curran.

Please be advised that the MHA Board of Commissioners will meet in an executive session regarding these issues and the possible termination of your employment on a date and at a time to be determined in the near future.

You will receive a notice regarding that executive session and your rights under the state Open Meeting Law. Until that meeting is scheduled, you are directed to remain away from the MHA office and its facilities.

(*Stipulated Facts; JExh.13: Testimony of Appellant, Coddington, Fortier & Moglia*)

41.   At a meeting of the MHA Board  on January 18, 2017, Ms. Curran submitted a written memorandum in support of her position that she was being wrongfully charged.  She stated that she was under tremendous stress but would make herself available to answer questions at a later date. (*JExh.10; App.Exh.25; Testimony of Appellant & Coddington*)

42.   The MHA Board designated Mr. Coddington as hearing officer to conduct an appointing authority hearing on Ms. Curran's contemplated termination, which was held on February 14, 2017. The MHA counsel submitted four exhibits (the charge letter, Ms. Curran's disciplinary record and the written notes of the two exit interviews).  Ms. Curran appeared on her own behalf and submitted a written statement under the penalty of perjury as well as copies of the material provided at the MHA Board Hearing on January 18, 2017. No witnesses testified and no other evidence was introduced. (*Stipulated Facts; JExhs.1,9 & 11; Testimony of Appellant and Coddington*)

43.   At Ms. Curran's request, Mr. Coddington left the record open for Ms. Curran to submit a written objection to the Board assigning Mr. Coddington as hearing officer rather than hold a hearing before the Board and to respond to the information contained in the two exit interviews which she had seen for the first time at the hearing on February 14, 2017. Ms. Curran submitted this post-hearing statement to Mr. Coddington on February 21, 2017. As to her objection, Ms. Curran contended that only a partial Board was present on January 18, 2017 and two of the three members were on the Board when Ms. Curran had reported to federal authorities the misconduct

15

that had been going on at the MHA. As to the written exit interview notes, Ms. Curran pointed to the coincidence that both employees resigned shortly after Ms. Moglia had stopped allowing overtime as well as the specific issues, unrelated to Ms. Curran, that they expressly described in those exit interviews. (*JExhs.11 & 14 [Curran letter dated February 20, 2017, attached]*)

44. On March 3, 2017, Mr. Coddington submitted his "Findings and Recommendations of Executive Director John Coddington Acting as Hearing Officer for the Medford Housing Authority Board of Commissioners." Mr. Coddington's findings were divided into two sections: "**Ms. Curran's Disciplinary Record**" and "**Conduct Resulting in Departure of Two Section 8 Employees**". The first section found that Ms. Curran had a "long and highly unsatisfactory disciplinary record", citing the exhibit containing the discipline Ms. Curran had received from 2011 through December 8, 2016. The second section found that the two employees had "expressly affirmed that Ms. Curran was the reason" each had left the MHA. Without identifying specific conduct or when it occurred, Mr. Coddington found that DR (Delores Ross) believed that Ms. Curran was "threatening and stalking" her, her conduct caused poor morale and the MHA would "continue to lose employees due to Ms. Curran." He also found that KR (Kathy Rolli) believed that Ms. Curran's "threatening" conduct (without specifying what the threats were or when they occurred) caused her to "fear for her safety" and that Ms. Curran "was a disturbance" and had "taken over" the workplace.

45. Mr. Coddington's findings included noting that Ms. Curran "denies that her workplace conduct resulted in the departure of the two employees"; "believes that she is the victim of workplace 'mobbing' stemming from her *alleged* activities with government agencies . . ." (*emphasis added*); "asserts that her personnel record has been altered to her detriment", and "specific employees of the [MHA] are retaliating against her." He found "no merit" to any of her

16

contentions and, specifically found "no credible evidence" to support her claims of mobbing and retaliation. (J*Exh.14*)

46. At a MHA Board special executive session on March 8, 2017, the Board asked Mr. Coddington some questions about Ms. Curran's past disciplinary history and, in particular, about the warning for violating the overtime rules, heard from Ms. Curran briefly, and engaged in a colloquy about the procedures for appealing a decision to this Commission.  Thereafter, without further deliberation, the Board voted 4-0 (one commissioner absent) "to accept the director's recommendation to discharge Ms. Curran by the end of the day – work day tomorrow." (*J.Exh.12*)

47. This appeal duly ensued. (*Claim of Appeal*)

**APPLICABLE LAW**

A tenured housing authority employee (with at least five years' service) may be discharged only for "just cause" after due notice, hearing (which must occur prior to discipline if it involves a suspension of more than five days) and a written notice of decision that states "fully and specifically the reasons therefore." G.L.c.121A,§29; G.L.c.31,§41.[13] An employee aggrieved by that decision may appeal to the Commission, pursuant to G.L.c.31,§43, for de novo review by the Commission "for the purpose of finding the facts anew." Town of Falmouth v. Civil Service Comm'n, 447 Mass. 814, 823 (2006) and cases cited.

The Commission's role is to determine "whether the appointing authority has sustained its burden of proving that there was reasonable justification for the action taken by the appointing authority." City of Cambridge v. Civil Service Comm'n, 43 Mass.App.Ct. 300, 304, rev.den., 426 Mass. 1102 (1997). See also Police Dep't of Boston v. Collins, 48 Mass.App.Ct. 411,

---

[13] Ms. Curran never received a "written notice of [its] decision" from the Board, the appointing authority, but the parties have treated the Board's "adoption" of Mr. Coddington's Findings and Recommendations as the equivalent of the required Section 41 written decision.  This approach is problematic as the Civil Service Law clearly calls for the appointing authority to articulate in writing the reasons for its decision, but the Appellant does not press this irregularity and the Commission need not address it as a matter of procedure

17

rev.den., 726 N.E.2d 417 (2000); McIsaac v. Civil Service Comm'n, 38 Mass.App.Ct. 473, 477 (1995); Town of Watertown v. Arria, 16 Mass.App.Ct. 331, rev.den., 390 Mass. 1102 (1983).

An action is "justified" if it is "done upon adequate reasons sufficiently supported by credible evidence, when weighed by an unprejudiced mind; guided by common sense and by correct rules of law." Commissioners of Civil Service v. Municipal Ct., 359 Mass. 211, 214 (1971); City of Cambridge v. Civil Service Comm'n, 43 Mass.App.Ct. 300, 304, rev.den., 426 Mass. 1102 (1997); Selectmen of Wakefield v. Judge of First Dist. Ct., 262 Mass. 477, 482 (1928) The Commission determines justification for discipline by inquiring, "whether the employee has been guilty of substantial misconduct which adversely affects the public interest by impairing the efficiency of public service." School Comm. v. Civil Service Comm'n, 43 Mass.App.Ct. 486, 488, rev.den., 426 Mass. 1104 (1997); Murray v. Second Dist. Ct., 389 Mass. 508, 514 (1983)

The Commission is guided by "the principle of uniformity and the 'equitable treatment of similarly situated individuals' [both within and across different appointing authorities]" as well as the "underlying purpose of the civil service system 'to guard against political considerations, favoritism and bias in governmental employment decisions.' " Town of Falmouth v. Civil Service Comm'n, 447 Mass. 814, 823 (2006) and cases cited. It is also a basic tenet of "merit principles" which govern civil service law that discipline must be remedial, not punitive, designed to "correct inadequate performance" and "separating employees whose inadequate performance cannot be corrected." G.L. c.31,§1.

G.L.c.31, Section 43 also vests the Commission with "considerable discretion" to affirm, vacate or modify discipline but that discretion is "not without bounds" and requires sound explanation for doing so.  See, e.g., Police Comm'r v. Civil Service Comm'n, 39 Mass.App.Ct. 594, 600 (1996) ("The power accorded to the commission to modify penalties must not be

18

confused with the power to impose penalties ab initio . . . accorded the appointing authority") Id., (*emphasis added*).   See also Town of Falmouth v. Civil Service Comm'n, 447 Mass. 814, 823 (2006), quoting Watertown v. Arria, 16 Mass.App.Ct. 331, 334 (1983).

## ANALYSIS

Applying these principles of civil service law to the facts of this appeal, I conclude that the MHA has failed to meet its burden to establish just cause for the decision to discharge Ms. Curran from employment by a preponderance of evidence.  The single alleged justification used to support the MHA's decision – that Ms. Curran's misconduct was the effective cause of the resignation of two other MHA employees – was not proved by a preponderance of evidence. In addition, the preponderance of the evidence established that Ms. Curran's prior disciplinary record, especially, but not exclusively, the discipline from 2011 to 2014 that had some nexus to Mr. Covelle's tenure, was more likely than not tainted by animosity against her stemming from her reputation as a "watchdog", and deserves little, if any, weight.

Alleged Substantive Grounds for Termination

The core reason MHA used to justify its decision to terminate Ms. Curran was Mr. Coddington's finding, which the MHAs Board adopted, without deliberation, that Ms. Curran's conduct caused two MHA employees to quit. This finding was based entirely on Mr. Coddington's reliance on a hearsay record containing conclusory statements by the two employees during their exit interviews, as recorded by Ms. Moglia in her exit interview notes. After hearing the evidence and considering this issue "anew", I have concluded that the MHA did not meet it burden of proof to show, by a preponderance of credible evidence, that Ms. Curran caused those employees to choose to leave the MHA for other jobs.

19

First, the disputed conclusory statements of two former employees, standing alone, deserve little, if any weight and neither employee provided credible specifics, either as recorded in the exit interview notes or through any credible testimony at the Commission hearing, which persuaded me to believe their conclusory statements.  To the contrary, I credit the preponderance of evidence of specific facts that these employees acknowledged in their exit interviews, and corroborated by credible testimony from Ms. Curran, Ms. McGrath and other witnesses and documents, which show that other plausible factors were a significant, let alone the primary cause that led these employees to decide to leave the MHA.

The factors that both employees mentioned included the crowded and uncomfortable basement working environment and each employee's dissatisfaction and discomfort with the duties of an LHC. In Ms. Ross's case, as a former administrative assistant, she described the job of LHS as "difficult", "unfamiliar" and "complicated" and that her supervisor was often too "busy" to assist her. I give little weight to the fact that Ms. Ross claimed that she had to take a "cut in pay" to return to her former employer, which was entirely due to the fact that, when Mr. Coddington recruited her to leave her administrative position to come to MHA at an increase in pay.  In Ms. Rolli's case, she specifically mentioned the curtailment of overtime, said that she was unaccustomed to not having her own private office, and "was done" with public housing work.

Second, I also find the timing of each employees departure telling. Ms. Rolli, who had left a supervisory position and took a demotion to LHS, began looking for another job soon after she was not selected for promotion to Leased Housing Director in or about September 2016. Similarly, Ms. Ross says she decided to leave MHA at about the same time, which coincides

20

with her mentor, John Coddington, announcing that he would soon be leaving his position as Executive Director.

Third, none of the MHA witnesses were able to provide specific, credible evidence of what Ms. Curran had done that supported the conclusory allegations, that her conduct put other employee in "fear" of their safety or otherwise made for an intolerable working environment. The witnesses called by the MHA was even more vague and lacking in specifics than the original interview notes themselves. The only specifics that were mentioned involved September 2016 incidents that were well-known to MHA management and thoroughly vetted at the time. Neither Ms. Ross nor Ms. Rolli claimed to be in fear before their exit interviews. Ms. Ross's almost slanderous characterization of Ms. Curran's mental status, and her unsubstantiated allegation that seven unidentified employees had been rumored to have left the MHA because of Ms. Curran, also caused me to give less weight to her testimony.. Similarly, I give diminished weight to Ms. Rolli's testimony that, even now, she believes that Ms. Curran will cause her harm as largely subjective fear that she never supported by any specific evidence in the record.

Fourth, I acknowledge and credit Ms. Curran's own self-assessment that, as a former public housing tenant, she was especially sensitive to how others treated public housing participants and may sometimes come off as "rough around the edges". I find, however, that Ms. Curran's critiques of her peers and supervisors, albeit imperfect in some respects, were motivated by her honest belief that she was pointing out irregularities and possible unlawful behavior that deserved to be rectified. To be sure, at times, calling out her peers and her supervisors did cause "friction" and interpersonal conflict, especially, around Ms. Ross's inexperience and Ms.

21

Curran's perception that Ms. Rolli did not respect tenants.[14] I do not find credible evidence, however, that the role she assumed as something of a strict, self-anointed and unpopular "ombudsman" ever turned malevolent or "impaired the efficiency of the public service".

<u>Ms. Curran's Prior Disciplinary Record</u>

The MHA's decision to terminate Ms. Curran was also inexorably tied to the record of prior discipline that she incurred. Ordinarily, reliance on a past history of discipline can be a legitimate factor in selecting the level of future discipline and, as required by basic merit principles, lawfully support a decision to separate an employee "whose inadequate performance cannot be corrected." In the circumstances presented here, however, Ms. Curran's record of past discipline is tainted by factors that make problematic the rote reliance by Mr. Coddington and the MHA Board on that record of discipline.

First, a substantial part of Ms. Curran's disciplinary record (2011 to 2014) was compiled during Mr. Covelle's tenure or can be attributed to input from those who fit Ms. Curran's description of supporters of Mr. Covelle and who remained behind after his departure. The credible evidence showed that Mr. Covelle, and by extension those within his orbit, had formed an animus against her. I am persuaded that the "wall" was erected around Ms. Curran was motivated by this animus; the excuse that it could be used as an interview space and was removable at any time was a pretext to get Ms. Curran's assent to the plan. I also find that Ms. Curran's proclivity to call out irregularities and possible unlawful behavior of her peers and superiors did not stop after the departure of Mr. Covelle but, in fact, she continued bringing complaints to management, which were regularly ignored, all the way through 2015 and 2016 until her termination. I am not certain whether management's animus stemmed from Ms.

---

[14] I note that Ms. Rolli's own testimony tended to confirm her discomfort with interaction with public housing tenants, whom she called "demanding" and who disrespected <u>her</u>, resulting in a decision to leave not just the MHA, but the public housing career field entirely.

22

Curran's refusal to "play along" or from her persistent critiques, or both, but the animus was definitely present.

Second, the decision to terminate Ms. Curran based on the departure of Ms. Ross and Ms. Rolli is flawed because the only specific examples of "misconduct" by Ms. Curran took place long before the warning she received on December 9, 2016 and there was no proof that Ms. Curran had done anything thereafter to demonstrate that warning had been ineffective. In fact, no one had considered the September 2016 remark to Ms. Ross remark a "threat" at the time and Ms. Curran thought she had smoothed over any ruffled feathers by her apology to Ms. Ross. Similarly, Ms. Rolli's departure on December 12, 2016 was fully known to MHA (and Ms. Curran), probably in October 2016, and certainly before December 9, 2016. Yet, Ms. Rolli had not made her "fear" known until the exit interview and MHA had fully vetted the one incident in September 2016 involving cross-complaints by both Ms. Curran and Ms. Rolli, finding no reason to discipline either one. The fact that MHA saw no reason to take any disciplinary action at the time makes the resurrection of those events problematic, especially so, when they purport to form the core specific incidents now offered to justify a termination decision.

Other Issues

I note, but, in view of the conclusion to allow this appeal, I need not address Ms. Curran's claim that she was denied a right of appeal on the merits from her past discipline. Finally, to the extent I have not addressed any of the other contentions raised by the parties, they "have not been overlooked. . . . [N]othing in them . . . requires discussion." McCormack v. Department of State Police, 92 Mass.App.Ct. 1103, 2017 WL 3469601 (Rule 1:28), *citing* Commonwealth v. Domanski, 332 Mass. 66, 78 (1954).

23

**CONCLUSION**

Accordingly, for the reasons stated, the appeal of the Appellant, Bonnie Curran in Appeal D-17-056 is ***allowed*.** The discharge is vacated and the Appellant shall be restored to all compensation and benefits to which she is entitled.

Civil Service Commission

/s/ *Paul M. Stein*
Paul M. Stein
Commissioner

By vote of the Civil Service Commission (Bowman, Chairman; Camuso (Not Participating], Ittleman, Stein & Tivnan, Commissioners) on August 15, 2019.


Either party may file a motion for reconsideration within ten days of the receipt of this Commission order or decision. Under the pertinent provisions of the Code of Mass. Regulations, 801 CMR 1.01(7)(l), the motion must identify a clerical or mechanical error in this order or decision or a significant factor the Agency or the Presiding Officer may have overlooked in deciding the case. A motion for reconsideration <u>does not</u> toll the statutorily prescribed thirty-day time limit for seeking judicial review of this Commission order or decision.

Under the provisions of G.L c. 31, § 44, any party aggrieved by a final decision or order of the Commission may initiate proceedings for judicial review under G.L. c. 30A, § 14 in the superior court within thirty (30) days after receipt of such order or decision. Commencement of such proceeding shall not, unless specifically ordered by the court, operate as a stay of the Commission's order or decision. After initiating proceedings for judicial review in Superior Court, the plaintiff, or his / her attorney, is required to serve a copy of the summons and complaint upon the Boston office of the Attorney General of the Commonwealth, with a copy to the Civil Service Commission, in the time and in the manner prescribed by Mass. R. Civ. P. 4(d).

Notice to:
Joseph Sulman, Esq. (for Appellant)
John Egan, Esq. (for Respondent)

24